## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

CARLY A. VOLP, as Personal
Representative of the Estate of
KYLE ROBERT VOLP,

     Plaintiff,

v.                                  Case No. 3:18-cv-689-J-32JRK

ANDREW WILLIAM SASSER, as
an individual, and NASSAU
COUNTY SHERIFF'S OFFICE, Bill
Leeper, in his official capacity as
Sheriff

     Defendants.

_____

## O R D E R

A correctional deputy used force on a pretrial detainee which resulted in the deputy being terminated and charged with misdemeanor battery. This is a civil rights actions arising out of this incident. The case comes before the Court upon Nassau County Sheriff's Office's ("NCSO") Motion for Summary Judgment (Doc. 57) on Counts II, IV, V, and VI of the Amended Complaint (Doc. 11) filed by Carly Volp, as a representative of the estate of Kyle Volp. At issue is: whether NCSO failed to adequately train its officers in violation of Section 1983 of the Civil Rights Act, 42 U.S.C. § 1983 (Count II); whether NCSO may be held liable for its employee Deputy Andrew Sasser's alleged

battery against Volp (Count IV); and whether NCSO negligently hired and retained Deputy Sasser (Counts V and VI). (Doc. 11). NCSO's Motion for Summary Judgment, to which Volp filed a response (Doc. 59), asserts that, as a matter of law, NCSO did not knowingly disregard a need for additional use of force training, that Deputy Sasser did not present a danger to inmates at the time of his hiring, and that Deputy Sasser was not unfit to be retained. (Doc. 57). NCSO also argues that it is entitled to sovereign immunity on the battery claim. Id. Deputy Sasser has not moved for summary judgment on the claims against him.

## I.    BACKGROUND

### A.    NCSO Training Programs and Policies

In July 2015, at the time of the subject incident, prospective NCSO officers were required to earn a certification from the Florida Correctional Basic Recruit Training Program (the "Academy") to gain employment as sworn NCSO correctional officers. (Docs. 57 at 4 n.46; 57-7 at 2). To earn a certificate, recruits were required to complete 420 hours of training. (Doc. 57-7 at 2). The Academy's training and courses covered officer safety, supervision of special populations, responses to incidents and emergencies, defensive tactics, and more. Id.

Under NCSO Directive 3522, newly hired officers were required to complete the NCSO Field Training Program to gain permanent appointment at NCSO. (Doc. 57-11 at 1–2). The purpose of the program was to give new hires

on the job training and provide NCSO a chance to observe new employees' capabilities firsthand. Id. NCSO Directive 3522 and Operating Procedure 105 also stipulated that new correctional officers were required to attend orientations that would familiarize them with use of force regulations and the rights of inmates. (Docs. 57-12 at 6–7; 57-11 at 2).

In addition to the Field Training Program, NCSO offered various trainings for its correctional officers. During Deputy Sasser's tenure at NCSO, NCSO offered trainings on the use of tasers, cell searches, pepper spray usage, legal updates, use of force, self-defense, supervising inmates with mental disorders, and more. (Docs. 57-7 at 2–3; 60-1 at 39; 57-12 at 7; 57-8; 57-10). NCSO also had policies that provided guidance on the use of force. (Doc. 57-12 at 240–41). For example, NCSO Directive 4030.20 states:

> Deputies will use the force and weapons necessary to affect lawful objectives and achieve control when executing their legal authority. Less lethal response may be used when control cannot be achieved through verbal commands and there is: 1. Physical or nonphysical resistance to an arrest; 2. A threat to life or to the safety of the deputy or another person, but lethal response would be inappropriate under the circumstances; or, 3. A reasonable belief that all alternatives have been exhausted, or would be ineffective. The type and degree of force or weapons used will be based on the facts of each situation encountered.

Id.

With regard to the use of restraint chairs, NCSO Directive 106 provides that restraint chairs may be used to maintain control of inmates, minimize the possibility of situations escalating, and provide safety for staff. Id. at 49–50, 52. The directive did not permit restraints to be used as punishment for disciplinary reasons, however. Id. at 50–53.

Finally, under NCSO Directive 4030.40, officers were required to submit an offense/incident report any time they used physical force or weapons in response to inmate resistance. Id. at 258. Superior officers were obligated to review reports to determine if the use of force was appropriate in each case. (Docs. 57 at 8; 57-12 at 260–63). Based on analyses of the reports, the Nassau County Sheriff Bill Leeper was briefed annually on use of force trends and patterns. (Doc. 57-12 at 266).

## B.   Deputy Sasser's Employment History

From September 2004 to February 2005, Deputy Sasser attended the Jacksonville Police Academy, graduating with a vocational certification at the end of his training there. (Docs. 59-11 at 113–14; 57-6). Deputy Sasser's time at the police academy overlapped with his employment at the Jacksonville Sheriff's Office ("JSO"), where he worked as a community service officer from December 2004 until July 2005. (Doc. 59-11 at 115–16). JSO forced Deputy Sasser to leave his position because he was charged with a misdemeanor DUI to which he pled no contest. Id.; (Doc. 57-3 at 117).

4

NCSO first employed Deputy Sasser as a full-time detention deputy from March 14, 2011 to September 14, 2011. (Doc. 59-11 at 2, 21). This position was temporary as Deputy Sasser had not entered the Academy's training program. (Doc. 57 at 4 n.46). NCSO conducted a background check before hiring him. (Doc. 59-11 at 150).

From August 27, 2012 to December 6, 2012, Deputy Sasser attended the Academy.[1] In December of the same year, Deputy Sasser passed the Florida state corrections exams, and NCSO rehired him as a correctional officer. Id. at 122, 125; (Doc. 57-7 at 2). During the application process, NCSO again conducted a background check on Deputy Sasser. (Doc. 59-11 at 125).

Upon hire, Deputy Sasser entered the NCSO Field Training Officer Program, which he completed without any noted deficiencies on April 26, 2013. Id. at 98. In August 2013, although not required, Deputy Sasser entered a 520-hour crossover program to become dually qualified as a correctional officer and a law enforcement officer. (Docs. 57-3 at 8–9, 13; 57-6). He completed the program in December 2013. (Doc. 57-6).

During his tenure at NCSO, Deputy Sasser was reprimanded at least seven times, and NCSO internal affairs investigated two instances of Deputy Sasser's misconduct. (Doc. 57 at 9–11). On June 15, 2011, Deputy Sasser told

---

[1] Deputy Sasser received his basic recruit certificate on January 16, 2013. (Docs. 59-11 at 102; 57-7 at 2).

an inmate to "Shut the f**k up," and a sergeant counseled him not to do this again. Id. at 11; (Doc. 57-22). On June 2015, Sheriff Leeper suspended Deputy Sasser without pay because he disobeyed direct orders to not bring electronic devices into the Nassau County Jail's ("NCJ") central control room. (Docs. 59-11 at 12; 57 at 10–12). NCSO also issued Deputy Sasser a written reprimand because he repeatedly disrespected one of his fellow detention facility employees. Id. At the same time, performance reviews show that NCSO generally considered Deputy Sasser's performance satisfactory. (Doc. 59-11 at 94, 102–07).

Deputy Sasser's battery of Volp on July 1, 2015 led to his termination. (Doc. 57-3 at 109–10). NCSO terminated Deputy Sasser on July 10, 2015 for conduct unbecoming of a law enforcement officer. (Doc. 59-11 at 3).

### C.   Deputy Sasser's Use of Force Against Volp on July 1, 2015

NCJ booked Volp on June 17, 2015 for violating the terms of his probation. (Doc. 60-1 at 22). During the intake process, Volp self-reported a number of mental health and medical issues, including that he was having knee and back pain. (Docs. 60-1 at 22; 59-6 at 15). He also reported that he had a contagious illness, which led jail staff to house him in a small, isolated cell. (Docs. 60-1 at 22; 59-6 at 15–17).

On July 1, 2015, Deputy Sasser was escorting a female inmate past Volp's cell when he noticed Volp making a disturbance. (Docs. 60-1 at 79; 59-6 at 17).

After completing the escort, Deputy Sasser returned to Volp's cell. (Doc. 59-6 at 17). Volp was lying peacefully in bed at this time, but Deputy Sasser felt it necessary to enter the cell to address the earlier disturbance. Id. Deputy Sasser believed that Volp had been trying to interact with the female inmate, and NCJ prohibits interactions between inmates of the opposite sex. (Doc. 59-6 at 17).

Deputy Sasser entered the cell pointing his finger at Volp, and Volp stood up. (Docs. 60-1 at 82; 59-6 at 17–18). A verbal exchange ensued, and Deputy Sasser commanded Volp to sit down, threatening that he'd use physical force if Volp disobeyed. (Docs. 60-1 at 82, 102; 59-6 at 17). Volp remained standing and pointed at Deputy Sasser's chest. (Doc. 57 at 2). In response, Deputy Sasser pushed Volp down towards his bed causing his body to slam into the cell's cinderblock wall. (Docs. 60-1 at 23, 102; 59-6 at 18). Deputy Sasser walked up to Volp, and as he spoke to Volp, he pointed his finger in Volp's face. (Doc. 59-6 at 18). Volp attempted to raise his hand, and Deputy Sasser slapped it away. Id.; (Doc. 57 at 3). By this time, a NCSO sergeant had noticed the altercation, and positioned himself at the entrance of Volp's cell. (Doc. 57 at 3).

Subsequently, Volp stood up, and Deputy Sasser responded by pushing Volp, causing Volp's head and back to slam into the cell wall. (Docs. 11 at 4; 59-6 at 19). Then, Deputy Sasser struggled to take Volp to the floor and restrain him. (Doc. 11 at 4). This prompted the sergeant who had been observing from the door and another NCSO officer to come to Deputy Sasser's assistance. (Docs.

7

57 at 3-4; 60-1 at 23). In the process of restraining Volp, Deputy Sasser kneed Volp in the back and struck Volp's right arm. (Docs. 57 at 4; 60-1 at 24, 82). After Deputy Sasser handcuffed Volp, Volp was placed in a restraint chair for an hour and forty-five minutes. (Docs. 57-6 at 20; 60-1 at 23). While in the chair, medical staff periodically checked on Volp. (Docs. 57-6 at 20; 60-1 at 76).

When Volp was removed from the chair, he fell to the floor complaining of back pain. (Doc. 60-1 at 24). After a nurse checked on Volp, NCSO officers left Volp lying on the floor for almost thirty minutes before calling emergency medical services ("EMS"). (Doc. 11 at 5). EMS transported Volp to the hospital with Deputy Sasser as his escort. (Doc. 60-1 at 24). Hospital doctors evaluated Volp's back and cleared him to return to jail. (Docs. 57-3 at 96; 60-1 at 102). Volp reported no visible injuries from the incident; he only reported internal back pain. (Doc. 60-1 at 102).

Based on the level of force that he used on Volp, Deputy Sasser was charged with misdemeanor battery to which he plead no contest, and NCSO terminated his employment. Id. at 103; (Doc. 57-3 at 37). NCSO did not take disciplinary action against Volp in relation to the July 1, 2015 incident. (Doc. 60-1 at 77).

### D.   Incidents Prior to the July 1, 2015 Volp Incident

Between January 2011 and July 1, 2015, NCSO officers prepared over 220 use of force reports. (Doc. 57 at 8). In one incident, an inmate shook his

genitals at an NCSO officer, and, in response, the officer pepper sprayed the inmate and then slammed the inmate's head down on concrete, knocking out the inmate's tooth and causing the inmate to lose consciousness. (Doc. 57-3 at 51). Deputy Sasser believed that the officer had killed the inmate, but the inmate survived. Id. In addition, an inmate alleged in a civil rights lawsuit[2] that, in 2014, in response to his failure to dress himself, NCSO officers sprayed his genitals with pepper spray and subsequently kicked, kneed, punched and beat him on the ground. (Doc. 59 at 9–11). The inmate contended that he never physically resisted or acted aggressively. Id. Nassau County Sheriff Bill Leeper and Deputy Sasser were named as defendants in the case. Id.

## II.   DISCUSSION[3]

Based on facts alleged in Volp's Amended Complaint and the substance of Volp's expert witness report, it may seem as though Volp has brought a

---

[2] See Gabor v. Leeper, No. 3:15-cv-640-J-39JRK (M.D. Fla. Oct. 26, 2016). Volp filed the order on the motion for summary judgment from the Gabor case in support of his response in opposition to NCSO's motion for summary judgment. (Doc. 59-7).

[3] Under Rule 56 of the Federal Rules of Civil Procedure, a motion for summary judgment should be granted "'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Estate of Todashev by Shibly v. United States, 815 F. App'x 446, 450 (11th Cir. 2020) (citing Fed. R. Civ. P. 56(a)). Once the movant "demonstrate[s] the absence of a genuine issue of material fact, the nonmoving party must come forward with specific facts showing a genuine issue for trial." Johnson v. Unique Vacations, Inc., 498 F. App'x 892, 895 (11th Cir. 2012). The Court views the evidence in the light most favorable to the non-moving party. See Shibly, 815 F. App'x at 450.

Section 1983 widespread practice of excessive force claim against NCSO. However, Volp did not. In the Amended Complaint, Volp has instead alleged a Section 1983 failure to train claim, which is distinct from a municipal excessive force claim.[4] He also pleads battery, negligent hiring, and negligent retention claims under Florida law. The Court proceeds to an analysis of these claims.

## A.     Count II: Section 1983 Failure to Train

Volp contends that NCSO violated his rights under the Fourth and Fourteenth Amendments by failing to adequately train its officers on how to properly respond to non-threatening pretrial detainees.[5] (Doc. 11 at ¶¶ 25–34).

---

[4] Thus, whether NCSO officers had a widespread practice of excessive force, as discussed in NCSO's motion for summary judgment and Volp's response thereto, is not an issue before the Court. This also makes Judge Davis's decision in Gabor, upon which Volp heavily relies, less pertinent. Indeed, in Gabor, Judge Davis granted summary judgment to Sheriff Leeper on the failure to train claim.

[5] The contemporary Fourteenth Amendment excessive force standard is analogous to the excessive force standard under the Fourth Amendment, rather than the Eighth Amendment. See Kingsley v. Hendrickson, 576 U.S. 389, 396–97 (2015) ("[A] pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable."); Piazza v. Jefferson Cty., 923 F.3d 947, 952–53 (11th Cir. 2019) ("[I]nasmuch as it entails an inquiry into the objective reasonableness of the officers' actions, the Fourteenth Amendment standard has come to resemble the test that governs excessive-force claims brought by arrestees under the Fourth Amendment."). Thus, the Court need not separately examine the alleged violation of Volp's Fourth Amendment rights. (Doc. 11 at ¶ 26). See Patel v. Lanier Cty., 969 F.3d 1173, 1180 n.4 (11th Cir. 2020) ("Although some courts have extended Fourth Amendment protections into the pretrial detention phase, '[n]either [this Court] nor the Supreme Court has decided whether the Fourth Amendment continues to provide individuals with protection from excessive force beyond the point at which an arrest ends and pretrial detention begins.'") (quoting Piazza v.

Under Section 1983, a sheriff's office, as a subdivision of local government,[6] may be held liable for having an official policy of inadequately training its employees that causes violations of the constitutional rights of detained persons. Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998). Cf. Cruz v. Beto, 405 U.S. 319, 321 (1972) ("Federal courts sit . . . to enforce the constitutional rights of all 'persons,' including [persons detained in jails]."); Wolff v. McDonnell, 418 U.S. 539, 555 (1974) ("There is no iron curtain drawn between the Constitution and the [jails] of this country."). To establish a failure to train claim, a plaintiff must show that the sheriff's office inadequately trains its employees, that failure to train is an official policy or custom of the sheriff's office, and that the policy or custom caused an employee to violate the plaintiff's constitutional rights. Giraldo v. City of Hollywood, 142 F. Supp. 3d 1292, 1306 (S.D. Fla. 2015). Such a policy of inadequate training may be proven by demonstrating that the failure to train evidenced a deliberate indifference to the rights of persons with whom sheriff's office employees come into contact. Gold, 151 F.3d at 1350.

---

Jefferson Cty., 923 F,3d 947, 952 n. 6 (11th Cir. 2019)) (alterations in original) (internal quotation marks omitted).

[6] In Section 1983 actions, Eleventh Circuit jurisprudence provides that Florida sheriffs are county officials as opposed to state officials. See Hutton v. Strickland, 919 F.2d 1531, 1542 (11th Cir. 1990); Bailey v. Wictzack, 735 F. Supp. 1016, 1019 (M.D. Fla. 1990).

As for the "deliberate indifference" element, a plaintiff must present some evidence that the sheriff had actual or constructive knowledge of a need to train in a particular area and the sheriff's office made a deliberate choice not to take any action. See id. In addition, a plaintiff "must demonstrate that constitutional violations were likely to recur without training." Am. Fed. of Labor & Cong. of Indus. Org. v. City of Miami, 637 F.3d 1178, 1189 (11th Cir. 2011).

Here, NCSO officers underwent substantial training at the Academy on a wide variety of topics, including use of force. (Docs. 57-3 at 8, 29–30; 57-7 at 2). Moreover, NCSO offered in-house use of force training and had policies and directives that provided instructions on the proper use of force. (Docs. 57-7 at 7–8; 57-11; 57-12). NCSO records show that on December 16 and 18, 2014, NCSO officers, including Deputy Sasser, attended a training tailored to help officers differentiate between threatening and non-threatening conduct and better understand what constitutes reasonable force when responding to verbal non-compliance. (Docs. 57-7 at 7-8, 10; 57-12 at ¶ 7). Deputy Sasser, however, testified that NCSO did not offer use of force training outside of the weapons context. (Docs. 59-2 at ¶ 3; 57-3 at 29–30).

While Volp accepts that NCSO had a training program, he argues that NCSO insufficiently prepared officers for interactions with non-threatening inmates. Volp fails, however, to proffer evidence that NCSO leadership—i.e., Sheriff Leeper—was aware of any deficiencies.

Ordinarily, to establish that a sheriff's office was on notice of training program deficiencies, a plaintiff must submit evidence showing a history or pattern of similar constitutional violations committed by sheriff's office employees.[7] <u>See</u> <u>Lewis v. City of West Palm Beach</u>, 567 F.3d 1288, 1293 (11th Cir. 2009) (reasoning that "if [a] city is aware that a pattern of constitutional violations exists, and nevertheless fails to provide adequate training, it is considered to be deliberately indifferent."); <u>Davis v. City of Montgomery</u>, 220 F. Supp. 3d 1275, 1283 (M.D. Ala. 2016). <u>But see</u> <u>Am. Fed. of Labor & Cong. of Indus. Org.</u>, 637 F.3d at 1189 (Notice may be evidenced by a "'widespread pattern of prior abuse' or even a single earlier constitutional violation."); <u>Lewis</u>, 567 F.3d at 1293 ("[D]eliberate indifference may be proven without evidence of prior incidents, if the likelihood for constitutional violation is so high that the need for training would be obvious."). Thus, to demonstrate that NCSO leadership was on notice, Volp needed to submit evidence showing a pattern of NCSO officers using excessive force on pretrial detainees (<u>i.e.</u>, a pattern of officers violating detainees' Fourteenth Amendment rights). <u>See</u> <u>Williams v. City of Birmingham</u>, 323 F. Supp. 3d 1324, 1332 (N.D. Ala. 2018) ("A prior incident may be relevant to a municipality's knowledge of the need for further

---

[7] "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." <u>City of Canton v. Harris</u>, 489 U.S. 378, 390 (1989).

training and supervision only insofar as the incident gave rise to a similar constitutional violation."). Volp points to two prior incidents involving the excessive use of force on non-threatening inmates. An NCSO deputy knocked out a non-threatening inmate's tooth and caused the inmate to lose consciousness. (Doc. 57-3 at 51). In addition, an inmate alleges that NCSO officers brutally beat him, even though he never physically resisted the officers or acted aggressively. (Docs. 59-7 at 5–6; 59 at 9–11).[8] While these incidents are serious, they alone are not enough to show a pattern of abuse of non-threatening pretrial detainees by NCSO officers. See, e.g., Thomas v. City of Jacksonville, No. 3:13-cv-776-J-32PDB, 2015 WL 13284967, at *28 (M.D. Fla. Feb. 17, 2015) ("[F]ive incidents of prior taser usage by [an officer], while possibly not ideal, are not sufficient to put the City on notice of the need for additional officer

---

[8] Here, Volp refers to the facts as established in the Court's order on the motion for summary in Gabor. At the motion for summary judgment phase, courts view the evidence in the light most favorable to the plaintiff. In other words, the Court never definitively determined that NCSO officers used excessive force in the Gabor case. In fact, NCSO officers contest the allegations described above. In his response in opposition to NCSO's motion for summary judgment, Volp, nonetheless, relies heavily on this case as evidence that NCSO's training program was clearly deficient. (Doc. 59 at 9–11). To the extent that Volp argues that this single incident shows NCSO's deliberate indifference to a need to train, the Court disagrees. See Keith v. Dekalb Cty., 749 F.3d 1034, 1053 n.56 (11th Cir. 2014); Whitaker v. Miami–Dade Cty., 126 F.Supp.3d 1313, 1325 (S.D. Fla. 2015) ("The single-incident liability exception is a narrow one and guidance is limited as neither the Supreme Court nor Eleventh Circuit has ever applied it"). Even though the facts in Gabor are distinct from those here, the Court notes that Judge Davis granted summary judgment on the failure to train claim.

training with regard to use of deadly force, and/or that its review of deadly force was inadequate."); <u>Graddy v. City of Tampa</u>, No. 8:12-cv-1882-T-24EAJ, 2014 WL 272777, at *9 (M.D. Fla. Jan. 23, 2014) (reasoning that "four incidents over a three year period are not indicative of a widespread pattern.").

In addition, Volp's expert expressed that:

> throughout the investigation of the Volp matter and during reviews of incident and use of force reports, it appears any word, act or movement by an inmate that can remotely be considered 'aggressive' is met by an immediate use of force, from physical to chemical to Taser, with little understanding by the personnel of what constitutes passive or active resistance.

(Doc. 60-1 at 46).

The opinion implies that the incident reports on record made it obvious to Sheriff Leeper that there was a need for updated or additional training. But the two hundred plus incident reports produced between 2011 and 2015 that form the basis of the expert opinion tell a different story.

NCSO requires officers to file incident reports after any use of force, regardless of whether the use of force was reasonable or unreasonable. (Docs. 57-3 at 52, 76, 80; 57-12 at 268). Thus, the reports analyzed by Volp's expert do not necessarily cover incidents in which NCSO officers wielded excessive force against non-threatening inmates—which is the relevant concern here. <u>Cf.</u> <u>Williams</u>, 323 F. Supp. 3d at 1336 ("[T]he Eleventh Circuit has indicated that a local government might be put on notice of inadequacies in its existing training

and supervision in a particular area only where policymakers are aware of a pattern of actual constitutional violations by governmental employees, not merely unsubstantiated complaints."); Stephens v. City of Tarrant, No. 2:16-cv-274-KOB, 2017 WL 34829, at *7 (N.D. Ala. Jan. 4, 2017) (determining that prior incidents involving "excessive force and violent behavior" generally by police did not support that the municipality was on notice of a need for additional training on taser usage because "excessive force, whatever it may have been, could have involved any number of actions—shooting, punching, placing someone in a choke-hold, etc."). In fact, many of the incident reports illustrate incidents in which the inmate showed signs of aggression and did not suffer injuries because of an officer's use of force. (Docs. 60-1 at 175–220; 57-13; 57-14). Even in the cases in which Volp's expert reasoned that officers should have done more to deescalate verbal altercations to avoid resorting to physical force, the expert concluded that the officers used permissible levels of physical force. (Doc. 59-5 at 37–49). Volp has, therefore, failed to show that the incident reports evidence prior Fourteenth Amendment rights violations such that Sheriff Leeper would have been on notice of a need for additional or improved officer training. See Whitaker, 126 F. Supp. 3d at 1323 ("[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.") (quoting Bd. of County Comm'rs v. Brown, 520 U.S. 397, 403 (1997)) (internal quotation marks omitted). Cf. Gold,

151 F.3d at 1351 (concluding that a plaintiff who submitted evidence "that there were 8,201 disorderly conduct arrests between 1986 and 1991 and that 601 such arrests were dismissed and 700 such arrests were nol prossed" failed to demonstrate that there were prior false arrests for protected speech, which was the conduct that caused the plaintiff's injury); Whitaker v. Miami–Dade Cty., 126 F.Supp.3d 1313, 1324 (S.D. Fla. 2015) (concluding that four prior police shooting incidents that took place over the course of a year did not support that the county was on notice of training deficiencies, insofar as the plaintiffs had not alleged "that these shootings were deemed unjustified, unconstitutional, or were anything other than legitimate, self-defense shootings.").

Volp also points to generalized statements suggesting that the NCSO training program was inadequate. Deputy Sasser testified that members of his unit, which included the officer responsible for training him, used force on inmates almost every night, and that he and other officers complained to NCSO sergeants and corporals that there was a need for updated use of force training (particularly pertaining to hands-on defensive tactics). (Docs. 57-3 at 23, 29–30, 57, 76). Despite this, Deputy Sasser's testimony demonstrates that training provided at the Academy prepared him to deal with non-threatening inmates. Deputy Sasser attested that, in the case of verbal altercations, he was trained to give verbal commands to the inmate, create a reactionary gap, where appropriate, and if the inmate failed to comply, he understood that officers

should use non-deadly force to restrain, handcuff, and place the inmate in a restraint chair. (Doc. 57-3 at 28–29). While Deputy Sasser's testimony perhaps shows that additional training could have benefited NCSO officers, it does not show that NCSO knowingly provided its officers with inadequate training.[9] Cf. Keith v. Dekalb Cty., 749 F.3d 1034, 1053 (11th Cir. 2014) ("While there may have been ways in which the [sheriff] could have improved the training of officers, the deliberate indifference standard requires a showing of more than gross negligence.").

Volp has failed to create an issue of fact that NCSO leadership was aware of a need to train NCSO officers on how to adequately respond to non-threatening pretrial detainees, or that existing training programs were inadequate. Accordingly, NCSO's motion for summary judgment as to Count II is due to be granted. See Gold, 151 F.3d at 1351 ("This Court repeatedly has held that without notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise.").

_____

[9] Admittedly, Deputy Sasser's testimony makes this a closer question than in other failure to train cases. But, in the absence of other evidence, Deputy Sasser's testimony is not sufficient to create an issue of fact under the deliberate indifference standard. "This high standard of proof is intentionally onerous for plaintiffs; imposing liability on a municipality without proof that a specific policy caused a particular violation would equate to subjecting the municipality to respondeat superior liability—a result never intended by section 1983." Gold, 151 F.3d at 1351 n.10.

**B.    Count IV: Battery Claim Against NCSO**

Deputy Sasser has not moved for summary judgment on Volp's battery claim against him. However, Volp also claims that NCSO should be held vicariously liable under Florida law for Deputy Sasser's alleged battery. (Doc. 11 at 13–14).

Under Florida law, a sheriff's office may be held liable for batteries[10] committed by its officers as long as the officers "acted within the course and scope of [their] employment and the [acts constituting the battery] [were] not committed in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard" of a detained person's human rights or safety.[11]

---

[10] Florida law defines battery as:

> the intentional infliction of a harmful or offensive contact upon the person of another. Police officers, however, get more leeway. They receive a presumption of good faith in Florida, and they are liable for battery only if they use excessive force when making a lawful arrest. A battery claim for excessive force is analyzed by focusing upon whether the amount of force used was reasonable under the circumstances.

Gomez v. Lozano, 839 F. Supp. 2d 1309, 1322 (S.D. Fla. 2012) (internal citations and quotation marks omitted).

[11] Florida's sovereign immunity statute renders the liability of correctional officers and their respective employers mutually exclusive. See Adams v. Lopez, No. 17-cv-23242-UU, 2018 WL 11149777, at *5 (S.D. Fla. May 8, 2018). The jury determines whether the correctional officer's use of force constituted a battery (i.e., whether the officer's of force was unreasonable under the relevant circumstances). See id. If the jury concludes that an officer committed a battery, the jury must then decide whether the officer committed the battery (1) in the scope of his employment and (2) in "bad faith or with

City of Boynton Beach v. Weiss, 120 So. 3d 606, 611 (Fla. 4th DCA 2013) (examining § 768.28(9)(a), FLA. STAT. (2007)); see also Gregory v. Miami-Dade Cty., 719 F. App'x 859, 873 (11th Cir. 2017). "Florida sovereign immunity does not bar all suits based on excessive force or battery by a [law enforcement officer] because those intentional torts 'do not inherently or necessarily involve . . . [bad faith, malicious purpose, or wanton and willful disregard of human rights,] which would activate immunity.'" Gregory, 719 F. App'x at 873 (quoting Richardson v. City of Pompano Beach, 511 So. 2d 1121, 1124 (Fla. 4th DCA1987)).

Florida courts have equated the phrase "bad faith," as used in section 768.28(9)(a), with the actual malice standard, and interpreted "malicious purpose" as conduct committed with "the subjective intent to do wrong." Peterson v. Pollack, 290 So. 3d 102, 109 (Fla. 4th DCA 2020). Florida courts have also reasoned that "wanton" conduct is performed "with a conscious and intentional indifference to consequences and with the knowledge that damage is likely to be done to persons," while "willful" conduct is conduct performed "intentionally, knowingly and purposely." Id. at 110. Therefore, for a sheriff's office to be shielded from liability for a battery claim, the conduct must be "much

---

malicious purpose or in a manner exhibiting wanton and willful disregard of [a plaintiff's] human rights [or] safety." See id.; see also § 768.28(9)(a), FLA. STAT. Only the officer or the municipality may be held liable, not both.

more reprehensible and unacceptable than mere intentional conduct."
Richardson, 511 So. 2d at 1123; see, e.g., Gallashaw v. Fla. Dep't of Corrections,
No. 3:20-cv-106-J-39MCR, 2019 WL 5569504, at *5 (M.D. Fla. Sept. 17, 2020)
("If true that [the defendant officer] intended to attack [and beat the decedent]
without cause and until [the decedent] lost consciousness, a reasonable person
could construe such conduct as malicious, reckless, or done with a willful and
wanton disregard of human rights or safety."); see also Williams v. City of
Minneola, 619 So. 2d 983, 985–86 (Fla. 5th DCA 1993) (reasoning that wanton
and willful conduct is equivalent to reckless conduct); Gregory, 719 F. App'x at
870 (adopting the Richardson court's reasoning that willful and wanton conduct
is conduct that is "more reprehensible and unacceptable than mere intentional
conduct").

   In its motion for summary judgment, NCSO does not address whether
Deputy Sasser was acting within the scope of his employment when he used
force against Volp on July 1, 2015; the Court assumes that he was. As for the
nature of Mr. Sasser's conduct, NCSO asserts that (1) Deputy Sasser used
"unreasonable" and "unnecessary" force when he shoved Volp, causing Volp's
head and body to slam into the cinderblock wall of his cell; and (2) Deputy
Sasser knew that if he pushed Volp, he would likely injury him due to the small
size of the cell. (Doc. 57 at 24–25). In opposition, Volp argues that the question

of whether Deputy Sasser acted with willful and wanton disregard should be determined by a jury. (Doc. 59 at 13).

The Court finds that there are genuine issues of fact as to how Deputy Sasser conducted himself on July 1, 2015, and these facts are material to whether Deputy Sasser intentionally battered Volp with wanton and willful disregard of Volp's human rights and safety. Even if Deputy Sasser used excessive force, a reasonable jury could find that he did not act with bad faith, malicious purpose, or willful and wanton disregard for Deputy Sasser's human rights or safety. Thus, NCSO's motion for summary judgment on Count IV is due to be denied, and the question of whether sovereign immunity absolves NCSO of liability is left to be decided at trial. See Perkins v. City of Jacksonville Beach, No. 3:06-cv-486-J-33MCR, 2007 WL 1796269, at *4 (M.D. Fla. Jun. 21, 2007) (The "'jury must weigh the evidence and decide whether [the deputy] committed no wrongdoing, abused his lawful authority to make an arrest, or acted in bad faith, with malicious purpose, or in a manner exhibiting wanton or willful [sic] disregard of human rights, safety, or property.'"). Cf. McGhee v. Volusia Cty., 679 So. 2d 729, 733 (Fla. 1996) ("[T]he question must be put to the fact-finder whether [the deputy] acted in bad faith, with malicious purpose, or in a manner exhibiting wanton or wilful [sic] disregard of human rights, safety, or property.").

## C.    Count V: Negligent Hiring Under Florida Law

Evaluating a negligence claim against a governmental entity is a two-step process under Florida law. See Hemmings v. Jenne, No. 10-61126-CIV, 2010 WL 4005333, at *5 (S.D. Fla. Oct. 12, 2010) (citing Lewis v. City of St. Petersburg, 260 F.3d 1260, 1262 (11th Cir. 2001)); see also Spadaro v. City of Miramar, 855 F. Supp. 2d 1317, 1338–39 (S.D. Fla. 2012). First, courts analyze whether the alleged tortious actions would subject a private citizen to liability. See Hemmings, 2010 WL 4005333, at *5–6. Second, courts consider whether the government actions at issue are discretionary in nature and thereby barred by the discretionary act exception to Florida's waiver of sovereign immunity. Id.; see also Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., 402 F.3d 1092, 1117 (11th Cir. 2005) (quoting Pollock v. Fla. Dep't of Highway Patrol, 882 So. 2d 928, 933 (Fla. 2004)) ("[B]asic judgmental or discretionary governmental functions are immune from legal action, whereas operational acts are not protected by sovereign immunity.").

Here, the alleged tortious action is the negligent hiring of Deputy Sasser. To establish liability for negligent hiring, plaintiffs must show that:

> (1) the employer was required to make an appropriate investigation of the employee and failed to do so; (2) an appropriate investigation would have revealed the unsuitability of the employee for the particular duty to be performed or for employment in general; and (3) it was unreasonable for the employer to hire the employee

> in light of the information he knew or should have
> known.

Malicki v. Doe, 814 So. 2d 347, 362 (Fla. 2002); see also Spadaro, 855 F. Supp. 2d at 1338–39.

Volp submits evidence showing that, prior to offering Deputy Sasser employment, (1) NCSO conducted a background check that revealed Deputy Sasser plead no contest to a misdemeanor DUI charge; and (2) an internal affairs investigation found that, during the NCSO Field Training Program, Deputy Sasser repeatedly disrespected a detention facility employee in violation of NCSO directives. (Docs. 59 at 11; 57 at 22). This evidence, however, is not enough to demonstrate that Deputy Sasser was ill-suited for the correctional officer position in which he would be authorized to use force.

Deputy Sasser's misdemeanor DUI charge is not related to acts of violence, and the conviction occurred approximately six years before NCSO hired him. (Doc. 57 at 22). The internal affairs investigation did not conclude that Deputy Sasser was disrespectful towards inmates. (Doc. 59 at 11). The record also shows that Deputy Sasser had previous experience working as a community service officer at JSO, passed correctional officer state board examinations, and completed basic recruit training at the Academy. (Docs. 57 at 22; 57-7 at 2). Thus, as a matter of law, the record does not support that

NCSO negligently hired Deputy Sasser. NCSO's motion for summary judgment as to Count V is due to be granted.

### D. Count VI: Negligent Retention Under Florida Law

"Negligent retention occurs when, during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicate [their] unfitness, and the employer fails to take further action such as investigation, discharge, or reassignment." Howard v. Wilkinson, 380 F. Supp. 3d 1263, 1288 (M.D. Fla. 2019) (quoting Shehada v. Tavss, 965 F. Supp. 2d 1358, 1378 (S.D. Fla. 2013)); see also Slonin v. City of West Palm Beach, 896 So. 2d 882, 884 (Fla. 4th DCA 2005) ("[T]here is no sovereign immunity barrier to making a claim against a governmental agency for negligent retention or supervision."); Thomas v. City of Jacksonville, No. 3:13-cv-737-J-32MCR, 2017 WL 3316478, at *10 (M.D. Fla. Aug. 3, 2017) ("[L]iability under the theory of negligent retention must relate to acts committed outside [of an employee's] scope of employment. By its very nature, an action for negligent retention involves acts which are not within the course and scope of employment.") (internal citations and quotation marks omitted). In addition, "[a] negligent . . . retention claim 'must be based on an injury resulting from a tort which is recognized under common law.'" Martinez v. Pavex Corp., 422 F. Supp. 2d 1284, 1298–99 (M.D. Fla. 2006).

Volp alleges that he was injured as a result of Deputy Sasser's battery on July 1, 2015. (Doc. 11 at 12–14). However, the record does not demonstrate that NCSO was aware that Deputy Sasser had a propensity to use excessive force on inmates. Before the incident involving Volp, NCSO reprimanded Deputy Sasser at least seven times for violating NCSO policies. (Doc. 57 at 9–12). None of these disciplinary actions stemmed from an inappropriate use of force. Therefore, Deputy Sasser's misconduct was not of the type that would put NCSO on notice that Deputy Sasser posed a threat to the safety of inmates. Deputy Sasser's actions (e.g., bringing an electronic device into a control room) were also not severe enough to merit discharge or reassignment. NCSO's motion for summary judgment as to Count VI is due to be granted.

Accordingly, it is hereby

**ORDERED:**

1. Defendant's Nassau County Sheriff's Office's Motion for Summary Judgment (Doc. 57) is **GRANTED** as to the Section 1983 failure to train claim (Count II), the negligent hiring claim (Count V), and the negligent retention claim (Count VI), and **DENIED** as to the battery claim (Count IV).

2. The Clerk shall withhold entry of judgment until the case concludes.

3. By separate notice, the Court will set a telephone status hearing.

**DONE AND ORDERED** in Jacksonville, Florida the 30th day of November, 2020.



TIMOTHY J. CORRIGAN
United States District Judge

tn
Copies:

Counsel of record